IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:14-CV-00494-GCM

| | | |
|---|---|---|
| RONNIE GARDIN, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| HI-TEX, INC., | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on Defendant's Motion for Summary Judgment (Doc. No. 29) and Memorandum in Support (Doc. No. 30), Plaintiff's Response in Opposition (Doc. No. 32), and Defendant's Reply (Doc. No. 33). Plaintiff alleges that Defendant wrongfully terminated him on the basis of his race and disability, and Defendant argues that the facts do not support these claims. For the following reasons, Defendant's Motion is **GRANTED**.

### I. BACKGROUND

**A. Plaintiff's employment and discharge**

Plaintiff Ronnie Gardin was hired by Defendant, Hi-Tex Inc., also known as Crypton, Inc. ("Crypton") on March 8, 2004 to operate a tenner frame in its King Mountain, NC manufacturing plant. His performance in this position was by all accounts average. For example, in 2008, when Crypton conducted layoffs because of the recession, Plaintiff was favorably evaluated and not included in those layoffs. Defendant acknowledges that Plaintiff's job performance had no bearing on his eventual termination. (Defendant's Memorandum in Support at 2, Doc. No. 30)

The parties also agree that Plaintiff had a dispute with his supervisor, Brian Fleetwood, a few days before his termination. (Defendant's Memorandum in Support at 4, Doc. No. 30; Plaintiff's Response in Opposition at 3, Doc. No. 32) On Friday, May 31, 2013, Fleetwood approached Plaintiff about his habit of beginning his 7 am shift with an immediate bathroom break. Fleetwood suggested that Plaintiff should use the bathroom prior to his shift, and Plaintiff responded that he could not control the timing of these breaks.

On Monday, June 3, Fleetwood again noticed that Plaintiff was not at his station at the beginning of his shift. Fleetwood identified this as behavior that Plaintiff should try to change. Plaintiff replied that he had no control over the timing, and told Fleetwood that if he "ever came into the stall" to get him that they "would have a problem." (Fleetwood Depo. at 24, Doc. No. 32-2)

At some point during the same morning, an interaction occurred in which Fleetwood needed for some reason to hand Plaintiff an A-frame, which he did. After this point, Plaintiff and Defendant's accounts of the interaction diverge. Plaintiff alleges that Fleetwood said to him, "Do you want to get off and go up the road?" (Gardin Depo at 80, Doc. No. 32-1) Plaintiff says that he responded, "Man, come on man, you don't know me like that, go on man," before returning to work. (Gardin Depo at 80, Doc. No. 32-1) Fleetwood, on the other hand, says that he confronted Plaintiff about making comments under his breath, and that Plaintiff responded by "running back and forth like a little kid" in his work area saying, "Look Brian, I'm doing my job. Look Brian, I'm on my job." (Fleetwood Depo. at 25, Doc. No. 30-4) Fleetwood says he told Plaintiff, "If there's something else you want to talk about, let's talk about it now." (Fleetwood Depo. at 25, Doc. No. 30-4) He claims that at this point, Plaintiff approached him and said, "You're going to get yourself hurt Brian, you don't know me." (Fleetwood Depo. at 25,

2

Doc. No. 30-4)  Fleetwood then asked, "Are you threatening me?"  Plaintiff did not reply. (Fleetwood Depo. at 25, Doc. No. 30-4)  Fleetwood states that he viewed this comment as a threat because of Plaintiff's seriousness, his tone of voice, and the look on his face.  (Fleetwood Depo. at 29, Doc. No. 30-4)

After the altercation, Fleetwood approached the plant manager, Chip King, and relayed his version of the events.  (King Depo. at 57, Doc. No. 30-2)  King determined that Fleetwood "truly felt like he was being threatened," and concluded that the situation was one the company couldn't tolerate.  (King Depo. at 57, Doc. No. 30-2)  He placed calls to Lance Keziah, the president of the company, Craig Rubin, the owner of the company, and Alan Barr, the Chief Operations Officer, to apprise them of the incident and his proposed response.  (King Depo. at 58, Doc. No. 30-2)

King then called Plaintiff into his office.  Fleetwood, and Fleetwood's supervisor, Justin Derrick were also present.  (Audio Recording; King Depo. at 68)  King asked Plaintiff what had happened.  (Audio Recording)  Plaintiff denied that anything had occurred that day, and Fleetwood responded with his version of events.  Plaintiff denied threatening Fleetwood, and claimed Fleetwood had said they should "go on up the road."  Fleetwood clarified that he had said "if you get loud with me on this floor, I will walk you out that door."  Plaintiff agreed, but maintained that Fleetwood had mentioned going up the road.  Plaintiff then attempted to bring up their disagreement about his bathroom breaks, but King stopped him, saying that the issue was Plaintiff's threatening comment to Fleetwood.  King informed Plaintiff that he would need to gather his things and leave, but that the company would not contest his eligibility for unemployment benefits.  Plaintiff became agitated, and began yelling at King.  It appears that Plaintiff also jumped out of his chair, as King asked him repeatedly, "Did you just jump up and

3

try to intimidate me? Did you just get up in my face?" King stated that he could not believe Plaintiff's version of the story in light of this angry reaction to his termination. As Plaintiff was escorted out he said "I'll be back," and "you did me wrong," several times as he left the building. He was ultimately informed that if he did not leave the building, the police would be called.

### B. Plaintiff's medical condition

It is undisputed that Plaintiff has diabetes, and that Defendant was aware of his diabetes. The only additional information in the record about Plaintiff's medical condition comes from deposition testimony of Eugene Reynolds, Plaintiff's treating physician. Dr. Reynolds testified that Plaintiff's habit of eating a breakfast biscuit at 6:30 am was "not good for diabetes" and that it could elevate his blood sugar. (Reynolds Depo. at 20-21, Doc. No. 30-6) Under these circumstances, Plaintiff probably would need to urinate shortly thereafter. (Reynolds Depo. at 20-21, Doc. No. 30-6) Dr. Reynolds further stated that this should not cause an extended bathroom break, and should require only about 4-5 minutes. (Reynolds Depo. at 20-21, Doc. No. 30-6) He also indicated that Plaintiff had been treated for urinary incontinence due to an enlarged prostate, but that the issue had been found to be unrelated to his diabetes. (Reynolds Depo. at 11-12, Doc. No. 32-4) Dr. Reynolds suggested that, if Plaintiff was spending between 15 and 20 minutes in the restroom, as some witnesses suggested, the likely medical explanation would be "pronounced diarrhea" caused by his breakfast. (Reynolds Depo. at 20-21, Doc. No. 30-6) Dr. Reynolds explained that Plaintiff had been on medication in 2007 that caused diarrhea, but that he had discontinued its use. (Reynold Depo. at 9, Doc. No. 32-4) In Dr. Reynolds's opinion, there was no medical reason that Plaintiff could not be prepared to begin his shift at 7 am. (Reynolds Depo. at 22, Doc. No. 30-6)

### C. Plaintiff's past misconduct

Defendant alleges that Plaintiff engaged in a variety of misconduct before he was terminated, ranging from sexual harassment to threats against other employees. (Defendant's Memorandum in Support at 3, 8-9, Doc. No. 30) Plaintiff denies that any of the incidents occurred (Response in Opposition at 5, Doc. No. 32), and despite alleging that some of the events were brought to the attention of Plaintiff's supervisors, Defendant has not presented corroborating evidence from Plaintiff's personnel file.[1] Further, Defendant readily concedes that it "did not learn about these incidents until *after* Plaintiff's termination and [that] these incidents were not considered in determining whether Plaintiff's employment should be terminated." (Reply at 4 n.1, Doc. No. 33) Thus, the Court finds that it cannot credit these allegations for the purposes of ruling on a motion for summary judgment.

### D. Procedural history

Plaintiff filed this action against Defendant in Gaston County Superior Court on June 24, 2014, and Defendant filed a notice of removal on September 9, 2014. (Doc. No. 1) On January 1, 2015, Plaintiff filed an amended complaint, alleging three claims: (1) race discrimination, in violation of Title VII of the Civil Rights Act of 1964; (2) discrimination on the basis of a disability, in violation of the Americans with Disabilities Act; and (3) wrongful discharge, in violation of N.C. Gen. Stat. § 143-422.2. (Doc. No. 18) On November 16, 2015, Defendant moved for Summary Judgment. (Doc. No. 29) On December 7, 2015, Plaintiff filed a Response in Opposition (Doc. No. 32), and one week later Defendant filed its Reply. (Doc. No. 33) This matter is now ripe for disposition.

---

[1] There is an "employee warning note" mentioning an incident of harassment by Plaintiff attached to the end of Chip King's deposition transcript. It is entirely unclear why Defendant chose not to present this document as an exhibit. In any event, it does not contain any details that would allow the Court to find that the alleged conduct occurred in accordance with Defendant's retelling.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence" in support of the non-movant's position is not sufficient to establish a genuine dispute. *Id.* at 252. A material fact affects the outcome of the suit under the applicable substantive law. *See id.* at 248. When determining whether a dispute is genuine or a fact is material, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Unsupported speculation, however, is insufficient to defeat a motion for summary judgment. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996).

## III. ANALYSIS

### A. Title VII claim

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discharge any individual" because of his race. 42 U.S.C. § 2000e–2(a)(1). A plaintiff can succeed on a race discrimination claim under Title VII either by showing direct proof of discrimination or by using the burden shifting analysis set out by the Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell-Douglas* framework, a plaintiff must first produce evidence that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was performing satisfactorily at the time of the adverse employment action; and (4) the adverse action occurred under circumstances that could support an inference

of discrimination. *Alloway v. City of Charlotte*, No. 3:13CV245, 2015 WL 276573, at *2 (W.D.N.C. Jan. 22, 2015). Typically, the fourth prong is met by showing that employees who were not members of the class were treated differently under similar circumstances, but comparator evidence is not required as a matter of law. *Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 545 (4th Cir. 2003).

If a plaintiff establishes a prima facie case of race discrimination, the employer has the burden of producing evidence of a legitimate, nondiscriminatory reason for the adverse action. *Id.* at 545. If the employer is successful, the burden shifts back to the plaintiff to show that the proffered reason is pretextual. *Id.* "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (alteration in original) (quoting *Tex. Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Here, Plaintiff cannot make out the elements of a prima facie case of race discrimination because he was not terminated under circumstances that could support an inference of race discrimination. Defendant has presented evidence that at least one white employee was fired for making inappropriate and insubordinate comments to a supervisor on a single occasion. (Fleetwood Affidavit, Doc. No. 29-6) Moreover, Defendant has presented evidence that Plaintiff was replaced by another African American. (King, Affidavit at 3, Doc. No. 29-9) Although Plaintiff argues that two supervisors previously used inappropriate language during a dispute and were not terminated, the Court cannot agree with Plaintiff that a line employee and a supervisor are similarly situated employees. (Response in Opposition at 12, Doc. No. 32) Furthermore, no one who witnessed that incident reported that the supervisors made any threats against one

7

another. (King Depo at 35-36, Doc. No. 30-2; Derrick Affidavit at 1, Doc. No. 29-5; Ayala Affidavit at 1, Doc. No. 29-3) In short, it is undisputed that employees outside the protected class have been treated the same under similar circumstances and that Plaintiff's position was filled by a member of the protected class. Therefore, Plaintiff has not demonstrated that the circumstances of his termination could support an inference of race discrimination.

Moreover, even if the Court were to proceed with the burden shifting analysis, Defendant has proffered a legitimate, nondiscriminatory reason for Plaintiff's termination. Plaintiff was informed that he was being fired because King learned of a comment he made to Fleetwood that was perceived as threatening. (Audio Recording) Additionally, Defendant's Personnel Policy clearly states that "[t]he Company will not tolerate any form of verbal or physical threats, physical violence, and/or intimidation of any of the Company's employees." (King Affidavit at 6, Doc. No. 29-9) The same provision further specifies that "[e]mployment may be terminated for violation of this policy." (King Affidavit at 6, Doc. No. 29-9) Plaintiff has put forth no evidence to suggest that the reason given for his discharge was a pretext for racial discrimination, and the Court can find no evidence in the record which would allow the Court to find that Defendant's explanation is "unworthy of credence." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (quoting *Burdine*, 450 U.S. at 256).

Plaintiff argues that because he has denied threatening Fleetwood since the meeting in which he was terminated, there is a genuine dispute of material fact as to whether he actually violated the company's Personnel Policy. (Response in Opposition at 11-12, Doc. No. 32) However, even if the Court accepts as true Plaintiff's version of the facts, and assumes that Plaintiff did not threaten Fleetwood, nothing in the record supports an inference that King did not believe Fleetwood's story. Nor is there any evidence to suggest that the real reason for his

termination was race discrimination. *See Holland*, 487 F.3d at 215 (affirming grant of summary judgment despite plaintiff's claim that he had not made the threats that served as the basis of his termination). Accordingly, Defendant's Motion for Summary Judgment will be granted as to Plaintiff's Title VII claim.

### B. ADA claim

The Americans with Disabilities Act provides that "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A plaintiff is a member of the class protected by the ADA if he suffers from "a physical or mental impairment that substantially limits one or more major life activities," or if others regard him as having such an impairment. 42 U.S.C. § 12102(1). To state a claim for discrimination under the ADA, a plaintiff must show that he (1) is a member of the protected class, (2) who suffered an adverse employment action, (3) during a time in which he was performing in accordance with his employer's expectations, and (4) the adverse employment action occurred under circumstances that could give rise to an inference of discrimination on the basis of the plaintiff's membership in the protected class. *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001). In the alternative, plaintiff can proceed on a "failure to accommodate" theory of recovery. To make out a claim for failure to accommodate a disability, a plaintiff must show that (1) he has a disability within the meaning of the statute; (2) his employer had notice of his disability; (3) with reasonable accommodation, he could perform the essential functions of his position; and (4) the employer refused to make a reasonable accommodation. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013).

9

Plaintiffs asserting disability discrimination may use the *McDonnell-Douglas* framework to prove their claims. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015). Under this approach, a plaintiff must first make out the elements of a prima facie case. *Id.* at 575. Once he has done so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for terminating the plaintiff. *Id.* If the employer is able to produce this type of evidence, the burden shifts back to the plaintiff, who must prove that the employer's asserted justifications are pretextual. *Id.*

Here, the Court concludes that Plaintiff has made out a prima facie case of disability discrimination. Plaintiff's diabetes constitutes a substantially limiting impairment, he suffered an adverse employment action, and his job performance at the time of his discharge was adequate. Additionally, there is no evidence in the record that other disabled employees retained jobs at Defendant's plant or that nondisabled employees were terminated for similar behavior, so the fourth element of the prima facie case is met. Nevertheless, the Court again finds that Defendant has produced evidence of a legitimate, nondiscriminatory reason for Plaintiff's termination—namely its belief that he had threatened his direct supervisor—and that Plaintiff has failed to produce evidence of pretext.

Plaintiff argues that his recent dispute with Fleetwood about the timing of his 7 am bathroom breaks constitutes evidence of that he was actually fired because of his disability. (Response in Opposition at 20, Doc. No. 32) The Court disagrees. As with Plaintiff's race discrimination claim, there is no evidence that suggests disability discrimination was the actual reason for Plaintiff's termination and at no point did Fleetwood, or any other employee, suggest that Plaintiff's frequent or extended bathroom breaks were a serious problem, much less a reason for his termination. There is also no evidence that Defendant disbelieved Fleetwood's account of

Plaintiff's threatening behavior. Thus, the circumstances of Plaintiff's discharge cannot support an inference of disability discrimination.

Plaintiff also argues that he has made out a prima facie case of failure to accommodate a under the ADA. In light of the uncontroverted testimony from Dr. Reynolds that Plaintiff did not require an accommodation in order to begin his shifts at 7 am, the Court is not convinced that Plaintiff has established the third element of the prima facie case. However, again, even if the Court applies the *McDonnell-Douglas* burden shifting framework, Defendant is still entitled to summary judgment. As with Plaintiff's other claims, there is no evidence that Defendant disbelieved Fleetwood's story that Plaintiff had threatened him, or that it used that story as a pretext to discharge Plaintiff rather than accommodate his disability. For these reasons, Defendant's Motion for Summary Judgment will be granted as to the ADA claim.

### C. Wrongful discharge claim

Plaintiff argues that because Defendant discriminated against him on the basis of his race and disability, Defendant violated not only federal law but also § 143-422.2 of the North Carolina General Statues. As the Court has explained, there is insufficient evidence in the record from which a reasonable factfinder could conclude that Defendant terminated Plaintiff's employment on account of either his race or his disability. Accordingly, Defendant's Motion for Summary Judgment will also be granted as to Plaintiff's wrongful discharge claim.

### IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**. The Clerk of Court is directed to close this civil case.

Signed: January 26, 2016

Graham C. Mullen
United States District Judge

11